# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JOSEPH C. SEGEN, M.D.,** | ) | Civil Action No.: 1:06cv00009 |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **BUCHANAN GENERAL HOSPITAL,** | ) | |
| **INC., et al.,** | ) | |
| Defendants. | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

This case was initiated by the plaintiff, Joseph C. Segen, M.D., ("Segen"), against Buchanan General Hospital, Inc., ("Buchanan General"), Dr. J. N. Patel, M.D., Dr. Dinkar Patel, M.D., Dr. Doric Turjman, M.D., Sue Rife, Joan Jamison, Kenneth Joseph Stephens, Beverly Anderson and Fred Pelle, (collectively "the defendants")[1]. The matter is currently before the court on the defendants' Motions to Dismiss the plaintiff's claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. (Docket Item Nos. 2, 23 and 35). In addition, this court will address the defendants' Motions for Sanctions as to Segen and/or his counsel for violations of Rule 11of the Federal Rules of Civil Procedure. (Docket Item Nos. 37 and 38). Pursuant to 28 U.S.C. § 636(b)(1)(B), these motions are before the undersigned magistrate judge by referral. As directed by the order of referral, the

---

[1] Dr. J. N. Patel, Dr. Dinkar Patel and Dr. Doric Turjman are represented by Thomas R. Scott of Street Law Firm. Buchanan General, Sue Rife, Joan Jamison, Beverly Anderson and Fred Pelle are represented by William W. Eskridge of Penn Stuart & Eskridge. All named defendants, with the exception of Kenneth Joseph Stephens, joined in the Motions to Dismiss. Stephens is not represented by counsel in this matter.

Case 1:06-cv-00009-GMW-PMS   Document 58   Filed 02/07/07   Page 1 of 43   Pageid#: 364

undersigned now submits the following report and recommended disposition.

## I. Procedural History

On January 23, 2006, Segen filed a complaint with this court against the defendants alleging claims of breach of contract, wrongful discharge, tortious interference with his employment contract, conspiracy, retaliation, denial of "due process rights" and defamation. (Docket Item No. 1, ("Complaint"), at 3-8.) Segen alleged that jurisdiction was conferred upon this court based on diversity jurisdiction.[2] (Complaint at 3.) He alleged that diversity of citizenship existed because he was a United States citizen, who currently resides in England, and the defendants were Virginia residents. (Complaint at 3.) In addition, Segen alleged that this court also possessed jurisdiction over this dispute "based upon Federal HIPAA[3] [v]iolations and numerous federally protected privacy violations." (Complaint at 3.)

On February 27, 2006, the defendants filed a Motion to Dismiss[4] for lack of

---

[2] The Complaint incorrectly states: "Jurisdiction of this case is conferred under 42 U.S.C. [§] 1343 diversity of citizenship...." A review of the United States Codes reveals that there is no 42 U.S.C. § 1343. The proper reference to statute giving the district court jurisdiction in diversity cases is 28 U.S.C. § 1332.

[3] HIPAA refers to the Health Insurance Portability and Accountability Act.

[4] The initial motion to dismiss was filed by William W. Eskridge on behalf of Buchanan General. On April 25, 2006, Eskridge filed an identical motion to dismiss on behalf of Sue Rife, Joan Jamison, Beverly Anderson and Fred Pelle. (Docket Item No. 23.) Then, on May 9, 2006, Thomas R. Scott filed a motion to dismiss on behalf of Dr. J. N. Patel, Dr. Dinkar Patel and Dr. Doric Turjman, which adopted the arguments set forth in the previously-filed motions to dismiss. (Docket Item No. 35.) Kenneth Joseph Stephens is not represented by counsel in this matter.

The motions will collectively be referred to as the "Motions to Dismiss."

-2-

subject matter jurisdiction.  (Docket Item No. 2), ("Motion to Dismiss").   The defendants argued that this court lacked subject matter jurisdiction because diversity of citizenship did not exist.  (Motions to Dismiss).  Moreover, the defendants argued that the court also lacked federal question jurisdiction because HIPAA does not provide for a private right of action.  (Motions to Dismiss).

In response to the first Motion to Dismiss, Segen argued that, at all relevant times, he "was/is domiciled in the state of New York."  (Docket Item No. 9, Response To Motion to Dismiss, ("Response"), at 1.)  He also asserted that he "had/has minimal and significant contacts with the state of New York," that he maintains continuing obligations with the state of New York and that he "deliberately engages himself in significant activities with the state of New York."  (Response at 1.)  Furthermore, he alleged that his residence in England was only temporary and that he had no intent to permanently establish a domicile or residence there.   (Response at 1.)   In the alternative, Segen contended that, at all relevant times, he "engaged/engages in minimal and significant contacts with the [s]tate of Florida," that he "deliberately engages/engaged himself in significant activities of the state of Florida" and that he has continuing obligations with the state of Florida.  (Response at 2.)

In the Response, Segen also explained that the defendants erroneously argued that he had asserted a private cause of action pursuant to HIPAA.  (Response at 2.)  Segen stated that he actually alleged "a violation of due process in that as a direct and proximate result of the 'whistle blowing' activities of [Segen], defendant's conspired and tort[i]ously interfered with the employment of [Segen] at [Buchanan General,] thereby violating his right of due process."  (Response at 2.)

-3-

On June 6, 2006, counsel for the defendants filed Motions for Sanctions against Segen and/or his counsel. (Docket Item Nos. 37 and 38, ("Motions for Sanctions")).[5] The defendants argued that Segen's claims were "not well grounded in fact, including jurisdictional facts," were "not supported by existing law or by a good faith argument for the modification, extension or reversal of existing law, either as to the jurisdiction of the court or the merits of the claim or both" and that the action was brought "for the purpose of vexation, annoyance and harassment and in an effort to extract a settlement." (Motions for Sanctions at 1.)

On July 24, 2006, the deposition of Segen was taken. On deposition, the questioning of Segen focused primarily on the factual basis for the claims brought against the defendants, as well as jurisdictional facts necessary to determine Segen's domicile. (Docket Item No. 44), (Deposition Of Joseph C. Segen, M.D., ("Segen Deposition")).

Segen then filed a second response to all of the Motions to Dismiss and the Motions for Sanctions on September 26, 2006. (Docket Item No. 43), ("Second Response"). Segen reiterated, verbatim, his earlier response, but also claimed that he "filed [this action] on good basis and facts due to the interference of [his] contract and [the] termination of [his] contract." (Second Response at 2.) Segen also asserted that he relied upon the statements made during his deposition to support his claims. (Second Response at 2).

_____

[5] The initial Motion for Sanctions was filed by William W. Eskeridge on behalf of Buchanan General on June 6, 2006. (Docket Item No. 37.) On that same day, Eskeridge filed an identical Motion for Sanctions on behalf of Sue Rife, Joan Jamison, Beverly Anderson and Fred Pelle. (Docket Item No. 38.)

-4-

## II. Facts

### A. Background

In October 1997, Segen accepted an offer to work as a pathologist at Buchanan General in Grundy, Virginia. (Segen Deposition at 16-17.) Prior to accepting the offer, Segen resided and worked in the New York and New Jersey area. In December 1997, Segen entered into a three-year written contract with Buchanan General. (Segen Deposition at 18; Segen Deposition, Exhibit 3, ("Three-Year Contract")). Based upon the terms of the contract, Segen was required to reside in Buchanan County, Virginia. (Three-Year Contract at Section 2.5.) The Three-Year Contract expired on its own terms without renewal or modification. (Segen Deposition at 174-76.) Thus, as agreed upon, the parties "continue[d] the employment relationship created under the terms [of the contract] on a monthly basis until terminated according to the provisions hereunder by either party." (Three-Year Contract at Section 6.1.) Therefore, upon the expiration of Segen's original Three-Year Contract, he continued his employment with Buchanan General on a month-to-month basis. (Segen Deposition at 175-76.)

Effective April 1, 2003, Segen entered into a one-year employment contract with Buchanan General. (Segen Deposition, Exhibit 3, ("One-Year Contract")). By letter dated January 29, 2004, Segen received a notice of nonrenewal from Buchanan General, which explained that, in accordance with Section 1.2 of the One-Year Contract, either party was permitted to provide 60 days notice of nonrenewal and terminate the contract. (Segen Deposition, Exhibit 3, ("Nonrenewal Letter")). Accordingly, Buchanan General notified Segen that the One-Year Contract would

Case 1:06-cv-00009-GMW-PMS   Document 58   Filed 02/07/07   Page 5 of 43   Pageid#: 368

automatically expire and terminate as of March 31, 2004. (NonRenewal Letter.) Then, by letter dated March 30, 2004, Buchanan General notified Segen that his April 1, 2003, contract would be terminated immediately because "pursuant to Section 2.8 of [the] Employment Agreement, [Segen was] required to provide notice of any reprimand by any licensing authority, and notice of any reason to believe that a complaint or proceeding would be made or filed against [him]." (Segen Deposition, Exhibit 3, ("Termination Letter")). Thus, Segen's employment with Buchanan General was terminated immediately.

*B. Jurisdictional Facts*

Once Segen entered into the Three-Year Contract with Buchanan General in December 1997, he moved to Grundy, Virginia, where he lived and owned property until well after his termination. Upon the termination of his One-Year Contract with Buchanan General, Segen was employed for approximately six weeks in February and March of 2004 with a Veterans Affairs facility in Togus, Maine. (Segen Deposition at 111-12.) Segen stated that he understood that the employment in Maine would be only a temporary position. (Segen Deposition at 112.) He also noted that, while working in Maine, he resided in a "two-month rental" property. (Segen Deposition at 126.)

Because the position in Maine was only temporary, Segen stated that he began considering employment opportunities available in Europe. (Segen Deposition at 113.) Segen stated that he received an offer to work in England in March or April of 2004. (Segen Deposition at 114.) However, because of certain licensing requirements,

Segen stated that there was a delay between when he received the offer and when he was actually able to begin work. (Segen Deposition at 114.) In the meantime, Segen stated that he attempted to find employment in New York; however, the job offer in England was the only option that became available to him. (Segen Deposition at 114.)

After working for approximately six weeks in Maine, Segen returned to his Grundy, Virginia, residence, where he remained for "five or six months" until he departed to attend the Armed Forces Institute of Pathology, ("AFIP"), in Bethesda, Maryland, for continuing education. (Segen Deposition at 115, 127.) Segen felt that since he had been out of formal medical training since the 1980s, it would be beneficial to attend the AFIP before he began employment in England. (Segen Deposition at 115.) Segen attended AFIP for nearly three months. (Segen Deposition at 127.) Thereafter, he returned to Grundy, Virginia, where he continued to live until late April of 2005, when he departed for England. (Segen Deposition at 115.)

Segen began his employment in England in May 2005. (Segen Deposition at 116.) Once in England, Segen first worked at Chase Farm Hospital before moving to Hereford, England, where he is currently employed as a pathologist at Hereford County Hospital. (Segen Deposition at 111, 116-18.) Segen explained that he has lived continuously in England since April 2005. (Segen Deposition at 128.)

On deposition, Segen acknowledged that he is not eligible to vote in England because he is not a citizen. (Segen Deposition at 129.) Furthermore, he noted that New York is "probably" the only place where he is still registered to vote. (Segen Deposition at 128.) However, Segen explained that he had not voted in New York

-7-

since the late 1990s.  (Segen Deposition at 129.)  While living in Virginia, Segen did not register to vote and did not file Virginia income taxes for 2003 and 2004.  (Segen Deposition at 129-30.)  Segen also stated that, as a result of his termination from Buchanan General, he was forced to sell real estate and rental properties that he owned in Buchanan County, Virginia. (Segen Deposition at 215-20.) Segen expressed a reluctance to sell his property because he "expect[ed] to die in Grundy."  (Segen Deposition at 220.)

## C.  Factual Support for Segen's Claims

As a result of the Motions for Sanctions that were filed with this court, during deposition, counsel for the defendants questioned Segen regarding the factual basis for his claims.  With regards to Count One of the Complaint, Segen alleged that he was wrongfully discharged from his employment with Buchanan General. (Complaint at 3-5.)  Segen alleged that he was initially informed that his termination was based upon economic reasons; however, he claimed that upon his actual termination, Buchanan General explained that his termination was due to a reprimand that he had received from the Board of Medicine.  (Complaint at 4; Termination Letter.) On deposition, Segen acknowledged that his contractual relationship was with Buchanan General and that Dr. J. N. Patel, Dr. Dinkar Patel and Dr. Doric Turjman had no authority to terminate his contract.  (Segen Deposition 187, 214.) Furthermore, defense counsel asked Segen if he had any evidence to demonstrate that Dr. J. N. Patel had anything to do with the alleged wrongful discharge by the hospital.  Segen replied, "[w]ell, if we discard the conspiracy [that is mentioned in later counts], then I am not aware of anything he specifically did, no."   (Segen Deposition at 185.)  Likewise,

-8-

Segen was asked the same question as it related to Dr. Dinkar Patel. Segen stated, "I believe that those things can be proven, but at this point they are not facts. They are not proven by deposition, so no." (Segen Deposition at 185.) As defense counsel questioned Segen further regarding Count One, the following exchange occurred:

> Q: [Did] anybody else give[] you any facts that in any way implicate J. N. Patel, Dinkar Patel, or Dr. Turjman that they breached your contract or induced the hospital to breach it or wrongful discharge?
>
> A: Only by implication in connecting the dots.
>
> Q: But no facts?
>
> A: No facts.
>
> Q: All right. And you knew that before this lawsuit was filed? You knew that you didn't have any facts to support that claim before this lawsuit was filed despite which you filed the claim and you hoped to prove it up when depositions are taken in the case. Is that right?
>
> A: I expect - - I expect it. I expect that those facts [will] be proven. Yes, I do.
>
> Q: So it's yes in response to my question?
>
> A: I don't have times and dates. I expect to have them. I expect that information to come forth.
>
> Q: I understand.
>
> A: At the time of filing, no, I didn't have those facts in place. Yes, I do expect those facts to come out.
>
> Q: Okay. And my question was[,] so you filed this suit without the facts, and you expect the facts to come out during the discovery process in the

suit. Is that correct?

A: I expect that, yes.

(Segen Deposition at 186.)

In Count Two, Segen alleged that Dr. J. N. Patel and Dr. Dinkar Patel tortiously interfered with his employment contract. (Complaint at 5.) Essentially, Segen alleged that, because his pathology reads did not suggest surgery, Dr. J. N. Patel and Dr. Dinkar Patel complained that they experienced a loss of income. (Complaint at 5.) In addition, Segen alleged that Dr. J. N. Patel would then demand a second reading from a different pathologist. (Complaint at 5.) Segen also claimed that Dr. J. N. Patel violated HIPAA standards by utilizing confidential medical records to gain information about patients to whom he had no physician-patient relationship, and then directly approached these patients to suggest surgery. (Complaint at 5; Segen Deposition at 21.) Segen explained that Dr. J. N. Patel wanted Segen to provide pathology readings that would suggest that surgery was necessary. He further explained that he was pressured to follow these demands because of Dr. J. N. Patel's influence at Buchanan General. (Segen Deposition at 40.)

On deposition, Segen stated that Dr. J. N. Patel implied in a conversation that he was losing money because the hospital had contracted to hire a second physician. (Segen Deposition at 187.) Segen claimed that Dr. J. N. Patel said, "[w]ell, you'll be paying for this." (Segen Deposition at 187-88.) Defense counsel asked if that was the only fact he had to show that Dr. J. N. Patel tortiously interfered with his contract, to which Segen responded, "[t]hat is the only fact, and that's more than enough." (Segen Deposition at 188.) Segen admitted that this was the only fact he had to support the

-10-

claim and explained, "I am so convinced that discovery will bring out this and many more facts that yes, I felt that I was not being irresponsible by doing that." (Segen Deposition at 189.)

When asked the name of a patient that Dr. J. N. Patel had obtained privileged information about, Segen stated that "[h]e got privileged information from a number of patients about whether their gallbladders needed to come out or not and whether they had high values on a HIDA scan." (Segen Deposition at 21.) Segen explained that, in the radiology department, there is a list of certain medical information contained in a particular book. (Segen Deposition at 21-22.) He claimed that Dr. J. N. Patel would search for patients with "high value[s]" and then approach them directly about the possibility of surgery. (Segen Deposition at 22.) Segen noted that Dr. J. N. Patel did this on a regular basis, and that he became aware of these practices two to three years before he was terminated. (Segen Deposition at 22.)

Segen was unable to identify any patients that Dr. J. N. Patel approached directly. (Segen Deposition at 24-25.) He stated, "I don't know those names specifically." (Segen Deposition at 23-24.) Segen then explained that Dr. Art Nieto informed him that several patients had been offended that Dr. J. N. Patel had approached them and that many considered the behavior to be unethical. (Segen Deposition at 24.) Continuing, defense counsel asked, "[d]o you, Dr. Segen, know the name of a single patient whom Dr. J. N. Patel approached when he had not previously had a physician-patient relation with them and he approached them because that he had learned the results of their HIDA scan from the radiology department of Buchanan General Hospital?" (Segen Deposition at 24.) Segen responded, "[n]o. I can get

-11-

those names. But no, I don't." (Segen Deposition at 25.) The defendants' counsel explained that at some point Segen would have to come forward with information to support his allegations. (Segen Deposition at 25.) Segen again responded, "[n]o, I do not know those names now." (Segen Deposition at 25.)

When questioned further regarding whether Dr. J. N. Patel had wrongly obtained confidential patient information, Segen commented, "[t]here's something that we all have as common knowledge. We all know that the sun is going to get up tomorrow because we're used to it. We had common knowledge in this hospital that that's the practice that J. N. Patel would do." (Segen Deposition at 191.) Segen stated that he had never seen Dr. J. N. Patel actually look for confidential patient information. (Segen Deposition at 191.) Segen claimed that a radiology technician would "slip[] information" to him and that Dr. J. N. Patel would then approach patients directly. (Segen Deposition at 191.)

Similarly, Segen noted that Dr. J. N. Patel had proceeded against Segen's advice and recommendation by performing major surgery on a patient. (Segen Deposition at 28-29.) Segen claim that, based upon the results of a polypectomy, he informed Dr. J. N. Patel that the results were precancerous and that there should be no operation on the patient. (Segen Deposition at 29-30.) However, Segen stated that Dr. J. N. Patel proceeded with surgery, despite the fact that surgery was not warranted. Segen was unable to identify the patient, but he stated that he had pictures of the patient and that the hospital was aware of this malpractice. (Segen Deposition at 29.)

Segen also was asked if he had any facts that demonstrated that Dr. Dinkar Patel

-12-

had toriously interfered with his contract. Segen admitted that he had no evidence to show that Dr. Dinkar Patel approached the hospital administration to induce the hospital to either terminate Segen's contract or not renew it. (Segen Deposition at 197.) Segen acknowledged that he had no facts or evidence to support these claims at the time the action was commenced; instead, he stated that he expected depositions to provide the information. (Segen Deposition at 190, 197.) Segen stated, "I don't have the fact[s]. I expect it to come out in discovery." (Segen Deposition at 190.)

Moreover, when defense counsel asked Segen whether or not he had reported any misconduct to the hospital administration regarding Dr. Dinkar Patel, Segen stated, "[n]o, specifically I did not." (Segen Deposition at 47.) On deposition, the following colloquy occurred:

Q: And what did Dr. Dinkar Patel do that you claim was tortious interference with your contract?

A: I believe that I wasn't given a fair and appropriate contract for a three-year extension as were other physicians in the hospital.

Q: Well, what did Dr. Dinkar Patel have to do with that?

A: In a community like that there is - - there are things that occur behind closed doors. I'm alleging that.

Q: Well, what is it you think he did behind closed doors that constituted tortious interference with your contract with the hospital?

A: I believe I wasn't given a fair and appropriate contract because the people who were major players in the hospital weren't - - basically said that I shouldn't have that contract. I believe that. And whether it's true or not, I don't know.

-13-

Q: What evidence do you have to back up that belief that Dr. Dinkar Patel was somehow responsible for you . . . not getting a second three-year contract with the hospital?

A: Dinkar Patel had been sanctioned by the federal government for multiple violations of medical and Medicare fraud. I had heard from a third party that he had questioned certain things and said that don't ask those type of questions about Dr. Segen.

Q: Was Dr. Dinkar Patel on the board of directors at the hospital?

A: No.

Q: Do you have any knowledge or information that Dr. Dinkar Patel lobbied any member of the board of directors to try to get them not to renew your contract for three years?

A: No. I believe it can be obtained, but no.

Q: Well, how do you propose obtaining that knowledge if you don't have it?

A: Deposing witnesses.

Q: Well, you have nothing at this point to . . . back up the allegations in your complaint that Dr. Dinkar Patel somehow interfered with your contract with Buchanan General Hospital?

A: No. Specifically no.

(Segen Deposition 49-51.)

In Count Three of the complaint, Segen alleged that Dr. Doric Turjman had tortiously interfered with his contract and conspired with Dr. J. N. Patel to provide pathology readings that Dr. J. N. Patel approved of, so that Buchanan General could

make more money.  (Complaint at 5-6.)  Segen was asked to explain the basis of his complaint against Dr. Turjman.  Segen stated that Dr. Turjman

> told me that back in August [2003,] when Dr. J. N. [Patel] decided that he didn't like the fact - - he didn't like the way I was reading slides.  He just didn't like the way I was doing it, so he took my slides, my tissues my work, the way that I make my money, and he had them sent down to Clinch Valley.  No reason, just he didn't like the way I was reading things.

(Segen Deposition at 58.)  Defense counsel clarified by stating, "[i]t wasn't work you had already done; it was work that you thought you should be allowed to do?"  (Segen Deposition at 58-59.)  Segen claimed that Dr. Turjman told him to read the slides the way Dr. J. N. Patel wanted them to be read.  (Segen Deposition at 59.)  Moreover, the defendants' counsel asked if Segen had any further conversations with Dr. Turjman about anything involving Buchanan General.  Segen stated,

> I don't recall specifically.  I don't know whether it's one conversation or two conversations in which he said he didn't want the work.  And I don't know if it was a separate conversation he didn't want the work, and then he wanted - - he suggested that for the way for me to keep my job would be to read the things whatever in the way that J. N. Patel asked me to or expected me to more.

(Segen Deposition at 59.)

Segen was asked, "do you have any evidence or facts that would prove or tend to prove that Dr. Turjman either verbally or in writing went to the administration of the hospital and/or to the board of the hospital to induce the board and/or the administration to either terminate your contract or not renew your contract?"  (Segen Deposition at

-15-

179.)  Segen responded, "[n]o, I don't believe he went to them to terminate the contract." (Segen Deposition at 180.)  Segen admitted that he had no facts to support his contention that Dr. Turjman had induced the hospital to terminate his contract or not to renew it.  (Segen Deposition at 199.)  He stated that he expected factual support to be uncovered during the discovery process.

Segen also was asked to provide the factual basis for his claim that Dr. Turjman and Dr. J. N. Patel conspired to read certain pathology reports in such as way that the hospital would make more profit.  (Segen Deposition at 199-200.)  In response, Segen explained that because Dr. J. N. Patel had allegedly stated that he had lost  money by virtue of Segen not recommending surgery, Dr. Turjman suggested that he read the pathology in the manner that Dr. J. N. Patel wanted them to be read.  (Segen Deposition at 200.)  Segen stated that this information was the sole basis for the conspiracy allegation in Count Three.  (Segen Deposition at 200.)

Segen alleged in Count Four that Sue Rife, President of the Board of Trustees of Buchanan General, conspired with other Board of Trustees members to wrongfully terminate his contract.  (Complaint at 6.)  On deposition, defense counsel asked Segen how Sue Rife had damaged him.  (Segen Deposition at 70.)  Segen stated that "Sue Rife wanted Fred Pelle to fire me as soon as I went to Italy on continuing education[.]  She went into his office and used every reason that she could think of . . . to get me sacked.  None of them had to do with my professional practice."  (Segen Deposition at 70.)  Among other things, he alleged that Sue Rife blamed him for the unlawful behavior of a young man who Segen had taken in because the young man's father was a drug addict.  (Segen Deposition 70-71.)  Segen also explained that the reason Rife wanted him fired

-16-

was because he had voiced his opinion that someone without a medical background should not be the president of the board of trustees of a hospital. (Segen Deposition at 72.) Segen stated, "I felt that a hospital should be run by physicians or people who are professionals, not people who their only contribution to society is being a high school cheerleader." (Segen Deposition at 72.) Thus, Segen opined that these statements created "a bit of a vendetta" and that Rife wanted him fired for personal reasons. (Segen Deposition at 72.) Segen stated that he was not aware of anything else that Rife had done that led to his termination. (Segen Deposition at 73.)

Segen claimed that Rife went to Fred Pelle, a former administrator at Buchanan General, in September 2003 and attempted to have his employment terminated. (Segen Deposition at 73.) He stated that "one of [his] physician friends . . . told [him] to watch [his] back, [because] Sue Rife [was] trying to get [him] fired." (Segen Deposition at 73.) Segen noted that he believed he did not receive a new three-year contract because of the comments that he had made regarding Rife. (Segen Deposition at 73.) Defense counsel asked Segen "what information do you have that Sue Rife had anything to do with your not getting a three-year contract?" (Segen Deposition at 73.) Segen replied, "[n]one. . . .We tend to connect dots in the world." (Segen Deposition at 74.) Segen specifically explained that Count Four of the complaint only pertained to Sue Rife and that it was not intended to include Dr. J. N. Patel, Dr. Dinkar Patel and Dr. Doric Turjman. (Segen Deposition at 201.)

In Count Five of the Complaint, Segen alleged that he was terminated from his employment with Buchanan General because he reported HIPAA violations and other violations to the hospital administration. (Complaint at 6.) Segen alleged that he

-17-

reported these violations to Joan Jamison, an administrator at Buchanan General, and Beverly Anderson, the compliance officer at Buchanan General. (Complaint at 6.) He further alleged that, as a result of reporting the violations, he was subjected to numerous complaints by the hospital, Dr. J. N. Patel and others. (Complaint at 6.)

On deposition, Segen was asked to describe any improper actions by Joan Jamison that caused him damages. (Segen Deposition at 74.) Because he had reported certain violations by Dr. J. N. Patel to Jamison, he opined that she "would make sure that the problems [for Dr. J. N. Patel] would go away." (Segen Deposition at 74.) Although Segen acknowledged that Jamison did not have a vote on the hospital's board of directors, he stated that she was "very influential at the hospital." (Segen Deposition at 75.) Defense counsel asked Segen if he could identify any act or any specific recommendation that Jamison made that had caused him to be damaged. In response, Segen explained that Jamison failed to act upon the violations he reported. (Segen Deposition at 75.) Additionally, Segen stated that Jamison "made it perfectly clear that [he] was more of the problem and that [he] needed to be deleted from the hospital system." (Segen Deposition at 76.) However, Segen admitted that she did not specifically say anything to him to indicate that she wanted him "deleted from the hospital system." (Segen Deposition at 76.) Defense counsel asked, "[c]an you tell me one statement that you think Joan Jamison has made that was responsible directly or indirectly for your being fired?" (Segen Deposition at 77.) Segen replied, "[n]o, I'm waiting for depositions." (Segen Deposition at 77.)

Segen was then asked to describe what Beverly Anderson had done to cause him damage. (Segen Deposition at 77.) Segen explained that he reported incidents to

-18-

Buchanan General's officers and no action was taken. (Segen Deposition at 78.) He claimed that, as a result of making the reports, he was terminated. (Segen Deposition at 78.) Thus, Segen stated, "I draw an inference from that, and I think it's an appropriate inference." (Segen Deposition at 78.) Counsel for the defense asked, "[c]an you tell me anything that Beverly Anderson did . . . that caused you to be fired?" (Segen Deposition at 78.) Again, Segen noted that he believed that he was fired as a result of reporting certain violations. Segen then admitted that he had no evidence to support his belief that Beverly Anderson caused his termination. (Segen Deposition at 78.)

Defense counsel asked if Segen could present any facts that would indicate that Dr. J. N. Patel went to the hospital administration and suggested, either verbally or in writing, that Segen be terminated for reporting alleged HIPAA violations. (Segen Deposition at 202.) Segen replied, "[w]ell, taking out the suppositions, no." (Segen Deposition at 202.) He then acknowledged that he had no facts or witnesses that would be able to say that "they [were] privy to a conversation between the hospital [and J. N. Patel] whereby J. N. Patel attempted to induce the hospital to terminate [him] or not renew [his contract] because of HIPAA violations." (Segen Deposition at 204.) Segen also stated that he knew that these facts were not available when he filed the suit, but that he expected them to come forth in discovery. (Segen Deposition at 204.)

In Count Six, Segen alleged that the hospital acted in bad faith by terminating his employment because on three previous occasions Buchanan General had maintained relationships with other physicians who had been restricted by the Board of Medicine. (Complaint at 7.) Segen claimed that the work of a particular physician at Buchanan

General had been presented to an outside institution for peer review. (Complaint at 7.) He further alleged that this physician was found to have committed ethics breaches and malpractice. (Complaint at 7.) Thus, Segen argued that his due process rights were violated because he did not receive the peer review similarly situated doctors had received, which he alleged was required by law. (Complaint at 7.)

Segen explained that the physician referred to in Count Six that was found to have committed ethics breaches and malpractice was Dr. J. N. Patel. (Segen Deposition at 153.) Segen noted that the incident that was subjected to peer review was the same incident mentioned in Count Two, when Dr. J. N. Patel performed major surgery on a patient despite Segen's recommendation against surgery. (Segen Deposition at 28-29.) He acknowledged that he was not aware of any other evidence to support any other incident that involved a physician whose work was submitted for peer review. (Segen Deposition at 153.) Although Segen claimed that Dr. J. N. Patel's actions were determined to be ethical breaches and malpractice, he admitted that he had not seen a report that indicated these findings. (Segen Deposition at 153.) Furthermore, despite allegations that he was entitled by law to peer review before his termination, Segen stated that he "would have to strike that [allegation]" because he was not aware of what law required peer review. (Segen Deposition at 157.) Segen also stated that he felt that his due process rights were violated because he did not receive a hearing explaining why he was terminated. (Segen Deposition at 157-58.) However, he never requested a hearing before any hospital committee or board. (Segen Deposition at 158.) Despite the fact that Segen had previously stated that Dr. J. N. Patel was the physician referred to in Count Six, he later stated that Count Six was not directed at Dr. J. N. Patel, Dr. Dinkar Patel or Dr. Doric Turjman. (Segen Deposition at 205.)

-20-

In Count Seven of the Complaint, Segen alleged that the defendants had defamed him. (Complaint at 7.) On deposition, Segen was asked which of the defendants had defamed him, to which he responded, "I believe Sue Rife did it. Do I have proof? No. I believe each one of the parties did, and I don't have proof, no." (Segen Deposition at 158.) The defendants' counsel then asked if he alleged that each defendant had defamed him. In response, Segen stated, "[y]es, I believe that Fred Pelle was in . . . position to do it." (Segen Deposition at 158.) When questioned as to the basis for the allegation, Segen admitted that he had no evidence to support the claims. (Segen Deposition at 159.) Segen stated that he felt he had been defamed "[b]ecause I didn't get any jobs afterwards . . . I connected the dots. Do I have evidence? No." (Segen Deposition at 160.) Segen clearly stated that Count Seven did not involve Dr. J. N. Patel, Dr. Dinkar Patel or Dr. Doric Turjman, as he had no facts to prove that any of the three doctors had defamed him. (Segen Deposition at 205.)

Count Eight of the complaint alleged that the defendants conspired to terminate Segen's employment. (Complaint at 8.) Specifically, Segen alleged that Kenneth Joseph Stephens, the former President of the Board of Trustees at Buchanan General, conspired and discussed the termination of Segen with others, which resulted in tortious interference with Segen's contract and wrongful discharge. (Complaint at 8.) In addition, he alleged that Stephens was interested in property that Segen owned and was in competition with Segen for other real estate. (Complaint at 8.) Segen also stated that Stephens, who owned a local lumber store, refused to give him a discount; instead, he claimed that Stephens commented that Segen's continued employment with Buchanan General was his discount. (Segen Deposition at 66.) Defense counsel asked Segen "[o]ther than not giving you a discount on building materials . . . how do you claim that

-21-

Joe Stephens has damaged you?" (Segen Deposition at 68.) Segen replied, "Stephens told me to raise the prices of my . . . apartments because he wasn't able to rent his. So[,] ultimately I priced myself out of the market for the first two years because of Joe Stephens, and that was my discount." (Segen Deposition at 68.) Segen explained that he followed Stephens's instructions and increased the rent because he felt that if he did not, it would have led to getting fired. (Segen Deposition 68-69.)

Segen was then asked, "[w]hat evidence do you have that any of the defendants conspired or agreed to do something illegal to terminate your employment?" (Segan Deposition at 161.) Segen answered, "I don't have depositions on that yet, no." (Segen Deposition at 161.) However, he explained that he expected to get evidence to support the allegations. (Segen Deposition at 161.) Segen noted that he had statements from three physicians to support his allegations. He stated that Dr. Art Nieto, Dr. Jeff Larsen and Dr. Will Lester all indicated that "[he] was in deep trouble because they were trying to get rid of [him]." (Segen Deposition 161.) Segen acknowledged that Count Eight did not pertain to Dr. J. N. Patel, Dr. Dinkar Patel and Dr. Doric Turjman. (Segen Deposition at 206.)

## II. Analysis

### A. Motions to Dismiss

A motion to dismiss made under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter jurisdiction of a complaint. There are two ways to present a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) which trigger

different standards of review. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). First, if the Rule 12(b)(1) motion attacks subject matter jurisdiction, by asserting that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," then "the facts alleged in the complaint are assumed to be true and the plaintiff . . . is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *See Adams*, 697 F.2d at 1219. Second, if the 12(b)(1) motion challenges the alleged jurisdictional basis of a complaint by asserting that, although facially adequate, the allegations are factually untrue, the district court may then consider extrinsic information beyond the complaint to determine whether subject matter jurisdiction exists. *See Thigpen v. U. S.*, 800 F.2d 393, 401 n.15 (4th Cir. 1986) (citing *Adams*, 697 F.2d at 1219).

In this case, the Rule 12(b)(1) challenge attacked the subject matter jurisdiction by arguing that the complaint failed to allege facts to establish diversity of citizenship, and, in the alternative, to establish federal question jurisdiction. (Motion at 1-2.) Here, the Motions to Dismiss will be treated as if they were Rule 12(b)(6) motions. Thus, pursuant to the Federal Rules of Civil Procedure, the court will accept as true all well-pleaded allegations and view the complaint in a light most favorable to the plaintiff. *See De Sole v. U. S.*, 947 F.2d 1169, 1171 (4th Cir. 1991) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)). "[A] rule 12(b)(6) motion should be granted only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co*., 883 F.2d 324, 325 (4th Cir. 1989). The court may not dismiss a complaint unless the plaintiff can prove no set of facts that would entitle the plaintiff to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416

U.S. 232, 236 (1974).

In his Complaint, Segen specifically asserted that this court had jurisdiction based upon diversity of citizenship. (Complaint at 3.) Additionally, Segen claimed that jurisdiction also was conferred upon this court "based upon Federal HIPAA [v]iolations and numerous federally protected privacy violations." (Complaint at 3.) In response, the defendants argued that this court lacked subject matter jurisdiction because, based upon the Complaint, Segen had failed to properly allege facts to establish diversity of citizenship. (Motion at 1-2.) The defendants also argued that Segen's alternative jurisdictional argument failed because HIPAA does not provide for a private right of action. (Motion at 2.)

Pursuant to 28 U.S.C. § 1332, federal district courts have original jurisdiction over all civil actions where the amount in controversy exceeds $75,000, and is between

> (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C.A. § 1332(a) (West 2006). In this case, the amount in controversy is not at issue, as Segen is seeking $4.5 million, plus attorneys' fees and costs expended. (Complaint at 8.) Here, the issue is focused upon whether Segen alleged sufficient facts to establish that diversity of citizenship exists. In his Complaint, Segen specifically stated that "[j]urisdiction of this case is conferred under . . . diversity of citizenship, since [Segen] is a United States citizen [who] now resides in England [and] the

Case 1:06-cv-00009-GMW-PMS   Document 58   Filed 02/07/07   Page 24 of 43   Pageid#: 387

defendants are residents of the Commonwealth of Virginia." (Complaint at 3.)

The Supreme Court has clearly stated that, "in order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) (emphasis in original); *see also Robertson v. Cease*, 97 U.S. 646, 648-49 (1878). In *Newman-Green, Inc.*, the petitioner was an Illinois corporation which, in its complaint, claimed that 28 U.S.C. § 1332(a)(3) conferred jurisdiction upon the district court because the party which it was suing was a United States citizen, domiciled in Venezuela. *See* 490 U.S. at 828. However, the Court explained that "the problem . . . is that [the defendant], although a United States citizen, has no domicile in any State." *Newman-Green, Inc.*, 490 U.S. at 828. Therefore, the Court determined that the defendant was "'stateless'" for purposes of diversity jurisdiction. *Newman-Green, Inc.*, 490 U.S. at 828.

Similarly, Segen, by his own admission, is a United States citizen who is currently residing in England. Diversity of citizenship is determined at the time an action is commenced. *See Freeport-McMoRan, Inc., et al. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991). Segen initiated this action on January 23, 2006; thus, diversity of citizenship must have existed as of that date. At the time this suit was commenced, Segen had been living and working in England continuously for approximately nine months. So, although Segen remains a United States citizen, he is no longer domiciled within a state. Thus, based upon Supreme Court precedent, Segen is stateless for diversity jurisdiction purposes. *See Newman-Green, Inc.*, 490 U.S. at 828. Because Segen has no domicile in any state, the parties in this case are not diverse; therefore,

based on the allegations contained in the Complaint, this court is without jurisdiction to hear this matter. Furthermore, based on the additional evidence provided, Segen can prove no set of facts under which the court may exercise diversity jurisdiction.

In his Response to the Motion to Dismiss, Segen attempted to add additional facts and arguments to establish jurisdiction. Segen claimed that, at all relevant times, he was and currently is, a domiciliary of New York. (Response at 1.) He argued that he has maintained "minimal and significant contacts" with New York, that he has maintained "continuing obligations" with the state of New York and that he has "deliberately ... engage[d] himself in significant activities" in New York. (Response at 1.) In the alternative, Segen made the same assertions with regard to the state of Florida. (Response at 2.) However, in his Complaint, there is no mention of any connection to New York or Florida. The Complaint simply states that Segen is a United States citizen who is currently living in England. On deposition, Segen offered no evidence of any connection or relationship to the state of Florida. Furthermore, Segen's only alleged connections with the state of New York are that he used to live and work there, that he has paid spousal and child support in New York and that he last voted in New York in the late 1990s. Based upon Segen's own statements, the facts indicate that Segen abandoned his New York domicile in 1997, when he moved to Virginia to begin his employment with Buchanan General.

In the alternative, Segen claimed that this court possessed jurisdiction "based upon Federal HIPAA [v]iolations and numerous federally protected privacy violations." (Complaint at 3.) The Supreme Court has recognized that "the fact that a federal statue has been violated and some person harmed does not automatically give rise to a private

-26-

cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979). Instead, the Court has stated that private rights of action that enforce federal law "must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

Various courts have specifically explained that Congress did not intend for HIPAA to create a private right of action. In an unpublished decision from the Roanoke Division of this court, a plaintiff argued that the defendant had violated HIPAA when it failed to seek authorization for the release of certain psychological medical information. *See Haranzo v. Dep't of Rehabilitative Servs.*, 2005 U.S. Dist. LEXIS 27302, at *14-15 No. 7:04cv00326 (W.D. Va. Nov. 10, 2005). The court noted that "no private right of actions exists for HIPAA violations" and dismissed the claim. *Haranzo*, 2005 U.S. Dist. LEXIS 27302, at *. In *Healthtek Solutions, Inc. v. Fortis Benefits Ins. Co.*, 274 F. Supp. 2d 767, 775 (E.D. Va. 2003), the court commented that HIPAA does not explicitly recognize a private right of action. Similarly, other courts have explained that HIPAA "specifically indicates that the Secretary of [Health and Human Services] shall pursue the action against an alleged offender, not a private individual. *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 155 (2004); *see also O'Donnell v. Blue Cross Blue Shield of Wyo.*, 173 F. Supp. 2d 1176, 1179-80 (D. Wyo. 2001) (the court found that HIPAA creates neither an express nor implied private cause of action).

In this case, Segen's Complaint precisely stated that "[j]urisdiction is also based upon . . . HIPAA [v]iolations and numerous federally protected privacy violations." (Complaint at 3.) The only federal law that Segen specifically refers to in his

-27-

Complaint is HIPAA. Based upon precedent from several jurisdictions, it is obvious that courts have determined that Congress did not intend for there to be a federal private right of action available under HIPAA. Thus, as to Segen's alternative argument, I am of the opinion that this court lacks subject matter jurisdiction to hear the case.

Segen also has asserted that the defendants erroneously interpreted his allegations regarding the HIPAA violations and that this matter is properly before the court pursuant to 28 U.S.C. § 1331. (Response at 2.) Segen argued that he did not allege a private cause of action under HIPAA, but, instead, that he "actually allege[d] a violation of due process in that as a direct and proximate result of the 'whistle blowing' activities . . . [the] defendant[s] conspired and tort[i]ously interfered with [Segen's] employment . . . thereby violating his right of due process." (Response at 2.) However, Segen made no mention of any applicable federal whistleblowing statute in his Complaint. In addition, this seems to be a completely distinct basis for jurisdiction than what was asserted in his original Complaint. Although Segen contends that this court has federal question jurisdiction, his claims of conspiracy and tortious interference with a contract simply amount to additional state law claims for which this court does not have diversity jurisdiction.

The Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, 31. The Supreme Court has held that the so-called "substantive" component of the Due Process Claims does not require a state to protect life, liberty and property of its citizens against invasion by private actors. *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, ___, 125 S.Ct. 2796, 2803 (2005) (citing

-28-

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). The Court also has held that the procedural component of the Due Process Clause "does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock*, 545 U.S. at ____, 125 S.Ct. at 2803.

With regard to Segen's "due process" allegations, Segen's Complaint references no governmental action. While Segen's Complaint makes reference to a denial of a peer review "as required by law," Segen has conceded that he and his counsel know of no such legal requirement. Also, the Complaint does not allege that Segen's employment contract provided any right of peer review. That being the case, I find that an ambiguous reference to "due process rights" within the Complaint is not sufficient to state a due process claim over which this court may exercise subject matter jurisdiction.

The assertions made by Segen in his Response to the Motion to Dismiss seem to be to ineffective attempts to correctly plead proper jurisdiction. However, on the face of the Complaint, as plead, it is obvious that this court does not have subject matter jurisdiction to hear this case. Furthermore, based on the additional evidence provided, it appears Segen can prove no set of facts under which the court may exercise federal question jurisdiction on the claims asserted. Accordingly, I recommend that the defendants' Motions to Dismiss be granted.

## B. *Motions for Sanctions*

Although I am of the opinion that this court lacks subject matter jurisdiction to hear this case, this court is, nevertheless, authorized to consider the Rule 11 Motions for

-29-

Sanctions that have been filed in this case. *See Willy v. Coastal Corp., et al.*, 503 U.S. 131, 137-39 (1992). In *Willy*, the petitioner argued that Rule 11 sanctions should not be considered because after the sanctionable conduct occurred, the Court of Appeals determined that the District Court lacked subject matter jurisdiction. *See* 503 U.S. at 137. The Court explained that a final determination of lack of subject matter jurisdiction in a case in federal court obviously prohibits further adjudication of the matter. *See Willy*, 503 U.S. at 137. However, the Court also noted that "such a determination does not automatically wipe out all proceedings had in the district court at a time when the district court operated under the misapprehension that it had jurisdiction." *Willy*, 503 U.S. at 137.

In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), the Court was faced with the issue of whether Rule 11 sanctions could be properly imposed for filing a frivolous complaint after the plaintiff had voluntarily dismissed the action. In *Cooter & Gell*, the Court explained that a federal court is permitted to consider issues that are collateral to the action after the action is no longer pending. *See* 496 U.S. at 395-96. Moreover, the Court stated that the decision to impose Rule 11 sanctions is not a judgment on the merits of the case; instead, "it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell*, 496 U.S. at 396. The Court determined that the imposition of a Rule 11 sanction does not amount to an assessment of the legal merits of a complaint; therefore, it does not raise the issue of whether a district court is deciding the merits of a case or controversy over which it does not possess jurisdiction. *See Willy*, 503 U.S. at 138 (citing *Cooter & Gell*, 496 U.S. at 396).

Thus, since the determination of whether Rule 11 sanctions are appropriate is a collateral issue based upon whether an attorney or unrepresented party has abused the judicial process, this court has the authority to render a decision as to the Motions for Sanctions, even though this court is of the opinion that it lacks subject matter jurisdiction to hear the case.

On June 6, 2006, pursuant to Rule 11 of the Federal Rules of Civil Procedure, the defendants filed Motions for Sanctions against Segen and/or his counsel. (Motion for Sanctions at 1.) The defendants argued that the action "was not well[-]grounded in fact, including jurisdictional facts," that it "was not supported by existing law or by a good faith argument for the modification, extension or reversal of existing law, either as to the jurisdiction of the court or the merits of the claim or both" and that the action was initiated "for the purpose of vexation, annoyance and harassment and in an effort to extract a settlement." (Motion for Sanctions at 1.)

In response, Segen argued that, at all relevant times, he was/is domiciled in the state of New York. He asserted that he had minimal and significant contacts with the state of New York, that he maintained continuing obligations with the state of New York and that he deliberately engaged in significant activities with the state of New York. Segen also claimed that, although he is currently living abroad, he had no intent of establishing a domicile or residence there. In the alternative, Segen asserted that, at all relevant times, he has engaged in minimal and significant contacts with the state of Florida, that he has deliberately engaged in significant activities in the state of Florida and that he had maintained continuing obligations with the state of Florida. Furthermore, Segen alleged that this action was filed "on good basis and facts due to

-31-

the interference of [his] contract and [the] termination of [his] contract." (Response To Motion To Dismiss And Motion For Sanctions, ("Response #2"), at 2.) In support of these arguments, Segen explained that he relied upon the statements he offered during his deposition, which was taken on July 24, 2006.

Rule 11(b) of the Federal Rules of Civil Procedure provides that, when presenting a

> pleading, written motion, or other paper [to the court], an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after a [reasonable inquiry in the matter, that] (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED. R. CIV. P. 11(b). This rule basically requires an attorney or unrepresented party to conduct a prefiling investigation of law and fact that is objectively reasonable under the circumstances. *Bus. Guides, Inc. v. Chromatic Commc'ns, Enters., Inc.*, 498 U.S. 533, 551 (1991).

Pursuant to Rule 11(c)(1)(A) of the Federal Rules of Civil Procedure, a motion for sanctions must first be served upon the party whose has allegedly committed a

-32-

violation of Rule 11(b); the served party is then allowed 21 days to withdraw or appropriately correct the challenged paper, claim, defense, contention, allegation or denial. Furthermore, according to Rule 11(c)(1)(A), if the served party does not respond during the 21-day "safe harbor" period, then the party seeking Rule 11 sanctions is permitted to file a motion for sanctions with the appropriate district court.

This court should apply an objective test of reasonableness when considering whether or not Rule 11 sanctions should be imposed. *See Artco Corp. v. Lynnhaven Dry Storage Marina, Inc.*, 898 F.2d 953, 955-56 (4th Cir. 1990); *see also Fahrenz v. Meadow Farm P'ship*, 850 F.2d 207, 210 (4th Cir. 1988). The fact that a plaintiff fails to provide a sufficient showing to survive summary judgment is not, in itself, enough to warrant the imposition of Rule 11 sanctions. *See Miltier v. Downes*, 935 F.2d 660, 664 (4th Cir. 1991). In *Miltier*, the Fourth Circuit explained that counsel need not be correct in their legal argument; instead, in order to avoid sanctions, the legal argument must be reasonable. *See* 935 F.2d at 664. However, an attorney is required to do more than simply rely upon the allegations and contentions of a client. As stated earlier, Rule 11 essentially mandates that an attorney conduct at least a minimal investigation before filing a complaint or otherwise formalizing the allegations. *See Blue v. U. S. Dep't of the Army*, 914 F.2d 525, 542 (4th Cir. 1990).

If this court determines that sanctions are warranted, the court has the authority to award the prevailing party reasonable expenses and attorney's fees that are incurred in presenting or opposing the motion. "A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(2). The Fourth Circuit has

-33-

determined that the district court should consider four factors in determining the amount of sanctions to impose: (1) the reasonableness of the opposing party's attorneys fees; (2) the minimum sanction necessary to deter the offending conduct; (3) the ability to pay; and (4) factors relating to the severity of the Rule 11 violation. *See Brubaker v. Richmond*, 943 F.2d 1363, 1374 (4th Cir. 1991); *see also Miltier*, 935 F.2d at 665. According to Rule 11(c)(2), the sanction can include

> directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

FED. R. CIV. P. 11(c)(2). However, monetary sanctions may not be awarded against a represented party for a violation of Rule 11(b)(2). Furthermore, in accordance with Rule 11(c)(3) of the Federal Rules of Civil Procedure, if a court determines that sanctions should be imposed, in its Order, the court "shall describe the conduct determined to constitute a violation . . . and explain the basis for the sanction imposed." FED. R. CIV. P. 11(c)(3).

As mentioned previously, the defendants claim that this action was "not well grounded in fact, including jurisdictional facts." (Motion for Sanctions at 1.) Based upon Segen's Complaint, as plead, existing law does not support his assertion of jurisdiction pursuant to 28 U.S.C. § 1332. Furthermore, the complaint presented no factual contentions to establish diversity of citizenship between the parties. In addition, Segen offered no argument for the "extension, modification, or reversal of existing law or the establishment of new law." FED. R. CIV. P. 11(b)(2).

-34-

A simple legal search of caselaw interpreting 28 U.S.C. § 1332 would have revealed Supreme Court precedent explaining that, for diversity jurisdiction purposes, a United States citizen living abroad is considered stateless. In his response to the Motion to Dismiss, Segen seemingly attempted to "correct" his misapplication of jurisdiction and claimed that he was actually a New York domiciliary, or, in the alternative, a Florida domiciliary. However, Segen presented no factual basis to demonstrate that, at the time this action was commenced, he was domiciled in any location other than England. The only viable argument that Segen could have made regarding a United States domicile would have been that he was/is a Virginia domiciliary. But, because the defendants are all Virginia residents, this also would fail, as a matter of law, to establish diversity of citizenship.

Based upon the face of the Complaint, I am of the opinion that Segen initiated this claim upon a contention that was not warranted by existing law. As stated in *Miltier*, counsel is not required to be correct in the legal position or argument; however, that legal position must be reasonable. *See* 935 F.2d at 664. Segen's counsel made a glaring mistake in asserting jurisdiction; a mistake which was unreasonable. Thus, it is this court's opinion that this action was brought forth without the support of existing law, and without a good faith argument as to why the current law should be altered. On the face of Segen's Complaint, he has presented a claim to this court that is neither well-grounded in jurisdictional facts nor supported by existing law. "A legal argument fails to satisfy Rule 11(b)(2) when 'in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified.'" *Guidry v. Clare*, 442 F. Supp. 2d 282, 288 (E.D. Va. 2006) (quoting *Hunter v. Earthgrains Co. Bakery*, 281 F.2d 144, 153 (4th Cir. 2002) (a

legal argument warrants Rule 11 sanctions if it has "absolutely no chance of success under the existing precedent"). Here, a reasonable attorney, under like circumstances, would have realized that, based upon existing law, proper jurisdiction did not exist. Accordingly, I recommend that sanctions be imposed against Segen's counsel for unreasonably asserting improper jurisdiction.

The defendants also contend that Segen failed to present a factual basis as to the merits of his claims. (Motion for Sanctions at 1.) After reviewing the Complaint, it appears that counsel sufficiently plead Segen's claims against the defendants. On deposition, when Segen was questioned as to the factual basis of each claim, he consistently stated that he knew he had no basis for his claims at the time the action was commenced. However, Segen repeatedly explained that he expected the factual support to be brought forth by virtue of the discovery process and after deposing witnesses. Rule 11(b)(3) requires that "the allegations and other factual contentions" must have evidentiary support or be "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3). Thus, based upon Rule 11(b)(3), at the time Segen made the statements on deposition, it seems as if Segen, despite acknowledging that he lacked a sufficient factual basis for his claim, has offered enough through his allegations to avoid sanctions.

However, it should be noted that the original Motion for Sanctions was presented to Segen's counsel in April 2006. (Motions for Sanctions at 2.) Upon presentation, Segen's counsel failed to correct the Complaint or withdraw it within 21 days, as required by Rule 11(c). In accordance with the Federal Rules of Civil Procedure, the defendants' counsel filed the Motions for Sanctions with this court in June 2006.

Segen's counsel did not respond to the Motions for Sanctions until September 26, 2006, when they reiterated their argument for diversity jurisdiction and clarified their contention for federal question jurisdiction. (Response #2 at 1-2.) In the Response, Segen stated that he "filed [the Complaint] on good basis and facts due to the interference of said contract and termination of said contract." (Response #2 at 2.) In support of these arguments, Segen stated that he relied upon "the statements made during depositions which were held on July 24, 2006." (Response #2 at 2.)

Approximately five months passed between the time Segen's counsel was notified of the Motions for Sanctions and when Segen's counsel responded. Furthermore, in response, Segen simply reiterated previous arguments and asserted that the Complaint was filed on "good basis and facts." Segen provided no additional evidence, facts or argument to demonstrate why sanctions should not be imposed. In addition, during the July 2006 deposition, Segen claimed that, while he was not aware of any facts to support his claims at the time the action was commenced, he expected the relevant facts to be uncovered during the discovery process and after depositions were taken. During Segen's deposition, as to virtually every count, he acknowledged that he either had no facts to support his claims, that he was waiting for depositions to be taken or that his claims were based upon inferences and not facts. In fact, it appears from the transcript of the deposition that Count Six was the only claim where Segen did not specifically say that he had no factual support. In Count Six, Segen claimed that his due process rights were violated because he was not afforded the benefit of a peer review and because other employees had received reprimands but had not been terminated. (Complaint at 7.) However, Segen plainly admitted that he did not request a peer review and that he was not aware of a law that required any such review, which contradicted what was asserted

-37-

in Count Six of his Complaint. (Segen Deposition at 157-58.)

Segen's deposition was taken in late July 2006. Since then, Segen has not come forth with any additional evidence, facts or depositions to support his claims. Nearly six months have elapsed since Segen asserted that he would present sufficient facts to support his claims. Segen has presented no additional evidence to this court, and, to this court's knowledge, has not attempted further discovery or filed any notice to take depositions. Rule 11(b)(3) clearly states that allegations and other factual contentions must have evidentiary support, or that counsel or the unrepresented party be able to produce such support after a "reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3). Thus, this court is of the opinion that Segen has had ample time, and more than a "reasonable opportunity" to produce evidentiary support that would demonstrate a good faith argument as to his claims.

In this case, it seems as if Segen's counsel has merely relied upon his allegations. An attorney has a duty to conduct a minimal investigation before filing a complaint or formalizing the allegations. *See Blue*, 914 F.2d at 542. Since filing the Complaint, Segen has produced no additional evidence to support his claims and has made no attempt to collect additional evidence. The only statements or evidence that have been provided, are Segen's own statements from the July deposition. However, this deposition only served as an opportunity for defense counsel to determine if facts were present to establish jurisdiction and to determine if there was a factual basis for Segen's claims. Far from supporting Segen's claims, not only did this deposition prove that there was no diversity of citizenship between the parties, but it also proved that Segen did not have evidentiary support for his claims at the time the action was commenced.

-38-

Segen's Complaint amounts to nothing more than mere accusations, without any substantive or factual basis to support it. In *Payman v. Wellmont Health Sys.*, 2005 U.S. Dist. LEXIS 784 at *22-23, No. 2:04cv00089 (W.D. Va. Jan. 20, 2005), this court determined that sanctions were warranted where the plaintiff physician based a discrimination claim solely upon two statements made by employees of the defendant and the subsequent hiring of another physician. This court held that the plaintiff's claims were not objectively reasonable. *See also Payman v. Mirza*, at *5 2003 U.S. Dist. LEXIS 3063, No. 2:02cv00023 (W.D. Va. Mar. 3, 2003) (where Judge Jones of this court found that the plaintiff failed to present objectively reasonable evidence to support the claims). Likewise, it is not objectively reasonable to base a complaint on implications or "connecting the dots."

In the case at hand, the fact that Dr. J. N. Patel allegedly stated that "you'll be paying for this" is a completely unreasonable basis for a claim considering Segen admitted that the alleged statement was the only fact he had to prove that Dr. J. N. Patel tortiously interfered with his contract. (Segen Deposition at 188.) Although Segen claimed that Dr. J. N. Patel had illegally obtained privileged patient information, he was unable to name one patient whose information had been taken. (Segen Deposition at 24-25.) Segen further explained that he based his allegations against Dr. J. N. Patel on "common knowledge," without any substantive facts to support those allegations. (Segen Deposition at 191.) Similarly, Segen acknowledged that his claims against Dr. Dinkar Patel and Dr. Doric Turjman were without factual basis and that he expected the information to come forth during the discovery process. However, Segen has made no attempt to discover this information.

-39-

When asked about the factual basis for his claims against Sue Rife, Segen stated that, because he had commented that someone without a medical background should not be the president of the board of trustees of a hospital, "a bit of a vendetta" was created and, thus, she wanted him fired. (Segen Deposition at 72.) Segen was questioned further regarding his evidentiary support for this claim, to which he responded, "[w]e tend to connect dots in the world." (Segen Deposition at 74.) Based upon this evidence, it is not objectively reasonable to claim that Sue Rife conspired to have Segen's contract terminated. *See Payman*, 2005 U.S. Dist. LEXIS 784.

Continuing, Segen acknowledged that his claims against Joan Jamison and Beverly Anderson were without evidentiary support. (Segen Deposition at 77-78.) Once again, Segen relied upon inferences and not facts. Segen repeatedly stated that he was waiting for depositions to be taken or that he "connected the dots." (Segen Deposition at 160-61.) However, Segen has yet to present any type of evidentiary support to substantiate his claims.

The purpose of Rule 11 sanctions is essentially to act as a deterrence to future litigation abuse and to provide a remedy for that abuse. *See In re Sargent*, 136 F.3d 349, 352 (4th Cir. 1998); *see also Brubaker*, 943 F.2d at 1373-74. If courts allow parties and/or their counsel to file actions upon mere accusations, without appropriate evidentiary support, the administration of justice will undoubtedly be adversely impacted. In this case, based upon Segen's deposition, it seems evident that Segen initiated this claim knowing that he had no factual basis to support his claims. Moreover, it is equally as evident that Segen's counsel, once put on notice that Segen had no evidentiary support, relied upon Segen's accusations and failed to conduct further

-40-

investigation and/or discovery that could have produced such support. Because Segen has failed to produce any relevant evidence to support his claims, I am of the opinion that sanctions are warranted in this case.

Accordingly I will enter a separate order giving the defendants 10 days to file a proposed statement of costs with this court.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  This action was commenced on January 23, 2006. At that time, Segen was a United States citizen who was domiciled in England;
2.  For purposes of diversity of citizenship, diversity is determined at the time the action is commenced;
3.  A person who is a citizen of the United States, but not domiciled within a State, is considered "stateless" for diversity jurisdiction purposes;
4.  Segen's Complaint alleged that jurisdiction was conferred upon this court based upon diversity of citizenship. However, Segen failed to allege facts to establish proper diversity;
5.  In his Complaint, Segen also alleged that jurisdiction was conferred upon this court based upon federal HIPAA violations and numerous federally protected privacy violations;
6.  In his Response to the defendants' Motions to Dismiss, Segen claimed that this court possessed federal question jurisdiction because he was denied due process when the defendants conspired against him and tortiously interfered with his contract as a result of his whistleblowing activity;
7.  HIPAA does not provide for a private cause of action;
8.  Segen failed to refer to any applicable federal whistleblowing statute, and his alternative argument for jurisdiction amounted to additional state law claims for which this court has no diversity jurisdiction to hear;

-41-

9.  Thus, Segen failed to allege facts upon which proper jurisdiction could be based;

10. The elements of a Rule 11 sanctions inquiry are: (1) whether the plaintiff made a reasonable inquiry to determine that the complaint stood well-grounded in fact; (2) whether the plaintiff made a reasonable inquiry to determine that the complaint was warranted by existing law; and (3) whether the complaint was filed for an improper purpose;

11. The Complaint was neither well-grounded in jurisdictional facts nor in facts to support Segen's legal claims;

12. The Complaint was not warranted by existing law or by a good faith argument to change the current law; and

13. Segen failed to provide factual support for his claims, and acknowledged that he knew he lacked this factual support at the time the action was commenced.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the defendants' Motions to Dismiss and grant the defendants' Motions for Sanctions.

## NOTICE TO PARTIES

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk also is directed to send copies of this Report and Recommendation to all counsel of record.

DATED:      February 7, 2007.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-43-